# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TRAVIS A. HAWTHORNE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00069 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Travis A. Hawthorne, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hawthorne protectively filed his applications for DIB and SSI on November 13, 2007, alleging disability as of August 2, 2007, due to a brain tumor and cyst, dizziness and blackouts, blurred vision, mood swings, balance problems, memory problems, difficulty concentrating, headaches, neck pain and fatigue. (Record, ("R."), at 105, 108-10, 113-16, 136, 146.) The claims were denied initially and on reconsideration. (R. at 60-65, 68, 70-71, 73-74.) Hawthorne then requested a hearing before an administrative law judge, ("ALJ"). (R. at 76.) The hearing was held on October 1, 2009, at which Hawthorne was represented by counsel. (R. at 23-55.)

By decision dated December 2, 2009, the ALJ denied Hawthorne's claims. (R. at 11-22.) The ALJ found that Hawthorne meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2012. (R. at 13.) The ALJ also found that Hawthorne had not engaged in substantial gainful activity since August 2, 2007, the alleged onset date. (R. at 13.) The ALJ determined that the medical evidence established that Hawthorne had severe impairments, namely status post suboccipital craniotomy for a tumor; hypertension-related headaches; degenerative disc disease of the lumbosacral spine; obesity; and depression/anxiety, but he found that Hawthorne's impairments

-2-

did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-15.) The ALJ also found that Hawthorne had the residual functional capacity to perform a limited range of light[1] work. (R. at 15-16.) Specifically, the ALJ found that Hawthorne could lift and/or carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently, that he could sit for a total of five hours in an eight-hour workday, stand for a total of four hours in an eight-hour workday and walk for a total of four hours in an eight-hour workday, that he could occasionally work at unprotected heights, work around moving mechanical parts, operate a motor vehicle, tolerate humidity and wetness and be around dust/odors/fumes/pulmonary irritants. (R. at 15.) The ALJ also found that any combination of Hawthorne's generalized complaints of pain, headaches, fatigue, anger issues, depression and side effects from medication would cause a moderate reduction in concentration, persistence and pace which would cause him to think about his problems for up to 10 seconds at a rate of about seven to eight times in any given hour, but he would not abandon tasks and would be able to complete a full workday. (R. at 15.) Therefore, the ALJ found that Hawthorne was unable to perform his past relevant work as a stock clerk, a cook/kitchen staff, a patient service tech, a cashier/stocker, a line cook, a dishwasher, a salesperson, a tent crew or a machinist. (R. at 21.) Given Hawthorne's age, limited education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that he could perform, including jobs as a parking lot attendant, a courier and a telephone order clerk. (R.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

-3-

at 22.)  Thus, the ALJ found that Hawthorne was not under a disability as defined under the Act and was not eligible for benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2011).

After the ALJ issued his decision, Hawthorne pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 1-4.) Hawthorne then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Hawthorne's motion for summary judgment filed April 5, 2011, and the Commissioner's motion for summary judgment filed April 20, 2011.

## *II. Facts*

Hawthorne was born in 1980, (R. at 26, 108, 113), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has an eleventh-grade education[2] and past relevant work experience as a machinist, a traveling specialty auto parts salesperson, a dishwasher, a retail cashier/stocker, a patient service technician, an overnight stocker, a cook and a derrick man on an oil rig. (R. at 27, 33-37.)  Hawthorne testified that he suffered from daily mid- and lower back pain due to degenerative disc disease, worsened by activity.  (R. at 38-39.)  He testified that he had been treated with steroid injections, muscle relaxants and anti-inflammatories.  (R. at 40.)  Hawthorne stated that he also suffered from leg pain

---

[2] A limited education means that an individual has ability in reasoning, arithmetic and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semiskilled or skilled jobs.  A seventh-grade through eleventh-grade level of formal education is generally considered a limited education.  *See* 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3) (2011).

-4-

and that he had difficulty sitting, walking or standing for prolonged periods. (R. at 40.) He also stated that he had numbness and weakness in his right dominant hand and pain in his right arm. (R. at 41.) He stated that he also suffered from headaches, which were not as severe following brain surgery in 2007 to remove a tumor and a cyst. (R. at 42-43.) Hawthorne testified that these headaches resulted in difficulty concentrating. (R. at 47.) He testified that since the brain surgery, he also continued to experience balance and vision issues. (R. at 41, 43.)

Robert Jackson, a vocational expert, also was present and testified at Hawthorne's hearing. (R. at 48-53.) Jackson classified Hawthorne's work as a stock clerk and as a derrick man as heavy[3] and semiskilled, as a cashier and stocker as heavy and semiskilled, but as performed as very heavy,[4] as a cook and kitchen staff person and as a line cook and kitchen prep person as medium[5] and skilled, as a dishwasher as medium and unskilled, as a patient services technician as very heavy and semiskilled, as a specialty auto parts salesperson as very heavy and semiskilled and as a machinist, assembler and tester as very heavy and skilled. (R. at 49-50.) Jackson testified that Hawthorne's skills from the salesperson job would transfer to light sales jobs. (R. at 50.) Jackson testified that a hypothetical individual of

---

[3] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2011).

[4] Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more. If someone can do very heavy work, he also can do heavy, medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(e), 416.967(e) (2011).

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2011).

-5-

Hawthorne's age, education and work history, who was limited as set forth in Dr. Titha's assessment and who also had pain in his back, legs and hands, neck aches, headaches, fatigue, depression and anger problems, a combination of any of which would result in a mild reduction in concentration, persistence and pace, but which would not result in abandonment of tasks and the individual could complete a full workday, could not perform any of Hawthorne's past work. (R. at 51.) Jackson testified that such an individual could perform the jobs of a parking lot attendant, a courier and a telephone order clerk. (R. at 51-52.) Jackson was next asked to consider the same hypothetical individual, but who had a moderate reduction in concentration, persistence and pace, with moderate being defined as lasting for 10 seconds seven to eight times per hour. (R. at 52-53.) Jackson testified that such an individual could perform the previously enumerated jobs. (R. at 53.) However, Jackson testified that the same individual, but who had a severe reduction in concentration, persistence or pace that would lead to abandonment of tasks, could not perform any jobs. (R. at 53.) Finally, Jackson testified that the hypothetical individual with a moderate reduction in concentration, persistence or pace, and who also would miss one workday weekly, could not perform any jobs. (R. at 53.)

In rendering his decision, the ALJ reviewed records from Smyth County Community Hospital; Wake Forest University Baptist Medical Center; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Michael Hartman, M.D., a state agency physician; Judy Street, F.N.P.; Dr. Mina Patel, M.D.; Dr. Ravi Titha, M.D.; Family Care Center; Northeast Tennessee Associate Neurology; and Highlands Neurology. Hawthorne's counsel submitted additional medical records from

Family Care Center and Judy Street to the Appeals Council.[6]

Hawthorne presented to the emergency department at Smyth County Community Hospital on July 29, 2007, with complaints of severe pain in the head and back of the neck, as well as nausea, dizziness, blurred vision, unsteady gait, hearing difficulty and blackouts for the previous two weeks. (R. at 240, 248.) A CT scan of the brain showed an extremely large Dandy-Walker malformation[7] with evolving hydrocephalus. (R. at 244, 246.) Following a neurosurgical consultation, Hawthorne was transferred to Wake Forest University Baptist Medical Center, ("Wake Forest"), where he underwent a suboccipital craniectomy for removal of the tumor on August 2, 2007. (R. at 252.) He was discharged on August 5, 2007, without complications. (R. at 257.) Hawthorne presented to Wake Forest on August 24, 2007, with complaints of continued wound drainage 12 days after staple removal, as well as fever. (R. at 259.) He was diagnosed with infected extracranial extraaxial fluid and underwent debridement and washout of the wound on August 26, 2007. (R. at 269, 271.) He tolerated the procedure well without complications and was discharged with a PICC line on August 31, 2007. (R. at 272.) Hawthorne returned to Wake Forest on October 1, 2007, at which time Monica Dittmer, P.A.-C., noted he was doing well and that his incision looked

[6] Since the Appeals Council considered this evidence in deciding not to grant review, (R. at 1-4), this court also must consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[7] A Dandy-Walker malformation is a rare congenital malformation involving the cerebellum and the fourth ventricle. It is characterized by agenesis or hypoplasia of the cerebellar vermis, cystic dilatation of the fourth ventricle and enlargement of the posterior fossa. *See* MEDSCAPE REFERENCE, http://emedicine.medscape.com/article/408059-overview (last visited Oct. 24, 2011).

"terrific." (R. at 275.) His PICC line was removed without incident, he was prescribed oral antibiotics, and he was scheduled for a follow-up MRI in five months. (R. at 275.)

Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Hawthorne on January 23, 2008, finding that he could perform medium work. (R. at 281-86.) Dr. Johnson found that Hawthorne could frequently stoop, kneel, crouch and crawl and occasionally climb and balance. (R. at 283.) He imposed no manipulative, visual or communicative limitations. (R. at 283-84.) Dr. Johnson opined that Hawthorne should avoid concentrated exposure to hazards, such as heights and machinery. (R. at 284.) He considered Hawthorne's activities of daily living, which included self care with some minor balance difficulties, performance of household chores, shopping, paying bills and caring for his daughter. (R. at 286.) Dr. Johnson further found that, based on the medical evidence, it was anticipated that Hawthorne would make a satisfactory recovery before the completion of the 12-month durational period. (R. at 286.)

Hawthorne saw Brenda Goodman, F.N.P. at Family Care Center, on March 4, 2008, with complaints of head, neck and back pain. (R. at 339.) He was diagnosed with neck pain, low back pain and anxiety, and he was referred to a pain management specialist. (R. at 339.)

On June 6, 2008, Dr. Michael Hartman, M.D., another state agency physician, completed a Physical Residual Functional Capacity Assessment, making identical findings as those of Dr. Johnson. (R. at 287-93.)

-8-

Hawthorne returned to Family Care Center on March 26, 2009, with complaints of radiating low back pain, worsening depression and anxiety, decreased sleep and irritability. (R. at 338.) Despite back tenderness, he had a full range of motion. (R. at 338.) Hawthorne was diagnosed with chronic low back pain and anxiety and depression. (R. at 338.) He was given instructions for home exercises, and Goodman noted that an MRI of the lower back would be scheduled if Hawthorne saw no improvement. (R. at 338.) X-rays of the lumbosacral spine taken that same day showed spina bifida of the S1 vertebra. (R. at 348.)

Hawthorne saw Dr. Gamal Boutros, M.D., on April 16, 2009, for a neurological evaluation. (R. at 327-32.) He complained of headaches twice weekly with photosensitivity and sensitivity to sound, as well as blurred vision and dizziness. (R. at 327.) He also reported a feeling of "losing control of [his] body" when he had a headache and laid his head back. (R. at 327.) Hawthorne reported that his hands and head would "twitch" at times. (R. at 327.) He reported that he had experienced these symptoms for approximately six months. (R. at 327.) Physical examination was unremarkable, including full range of motion in upper and lower extremities, full muscle strength for all groups tested, normal muscle tone in all extremities, normal deep tendon reflexes, absent Babinski's reflex,[8] normal sensory examination, negative Romberg's sign,[9] stable gait and station and

---

[8] Babinski's reflex refers to the dorsiflexion of the big toe on stimulating the sole of the foot. It occurs in lesions of the pyramidal tract and indicates organic, as distinguished from hysteric, hemiplegia. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1438 (27th ed. 1988).

[9] Romberg's sign refers to a swaying of the body or falling when standing with the feet close together and the eyes closed. Romberg's sign is observed in tabes dorsalis. *See* Dorland's at 1525.

normal coordination.  (R. at 328.)  A nerve conduction study also was normal. (R. at 327, 329-32.) Dr. Boutros diagnosed status post suboccipital craniotomy, hypertension-related headaches and obesity, and he prescribed lisinopril and Inderal.  (R. at 328.)

On May 26, 2009, Hawthorne complained of continued back pain and lack of energy.  (R. at 337.)  Judy Street, F.N.P., diagnosed fatigue and pain in the thoracic spine and lumbar spine. (R. at 337.) Hawthorne again received home physical therapy instructions. (R. at 337.) An MRI of Hawthorne's lumbar spine, taken on June 9, 2009, showed small central disc protrusions at the L4-5 and L5-S1 levels of no neurologic sequela and no evidence of spinal or foraminal stenosis or nerve root impingement. (R. at 341.) An MRI of the thoracic spine showed early degenerative changes in the disc spaces between T7 and T10 with Schmorl's nodes[10] formation and a small bulging annulus at T9-T10. (R. at 340.) On June 17, 2009, Street diagnosed thoracic spine pain and lower back pain, as well as fatigue. (R. at 336.) That same day, Street completed a Patient Injury and Work Status form, stating that she was treating Hawthorne for pain of the thoracic spine and lumbar spine, neck pain, Schmorl's nodes of the thoracic spine, degenerative disc disease and status post brain tumor. (R. at 335.) She opined that he was unable to work permanently. (R. at 335.)

Hawthorne saw Dr. Ravi Titha, M.D., for a consultative evaluation of weakness and occasional blackout spells, on June 24, 2009, at the request of Disability Determination Services. (R. at 311-15.) He was in no acute distress,

---

[10] Schmorl's nodes refers to nodules seen in roentgenograms of the spine, due to prolapse of a nucleus pulposus into an adjoining vertebra.  *See* Dorland's at 1143.

-10-

gross and fine manipulations were normal, heart rate and rhythm was normal without murmur, there was no kyphosis or scoliosis of the back, no paravertebral muscle spasms were noted, and straight leg raise testing was negative to 90 degrees. (R. at 313-14.) Cranial nerves were intact, and Hawthorne had full strength in all extremities. (R. at 314.) Sensory examination in all extremities was normal, deep tendon reflexes were 2+, and Romberg's sign was negative. (R. at 314.) Dr. Titha diagnosed generalized weakness, blackout spells, benign essential hypertension, depression, neck pain, history of astrocytoma in the cerebellum, status post removal in 2007, prior right knee surgery and history of meningitis. (R. at 314.) Dr. Titha noted that Hawthorne did not use any ambulatory device and that neurological examination was "completely normal and does not have any cerebellar signs." (R. at 314.)

Dr. Titha opined that Hawthorne could sit, stand and/or walk for four to five hours in an eight-hour workday and that he could lift and carry items weighing up to 20 pounds frequently. (R. at 315.) No other limitations were imposed. (R. at 315.) On June 28, 2009, Dr. Titha completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical), finding that Hawthorne could lift and carry items weighing up to 20 pounds frequently and up to 100 pounds occasionally. (R. at 302-09.) Dr. Titha further found that Hawthorne could sit and/or stand for up to three hours at a time and that he could sit for a total of five hours in an eight-hour workday and stand for four hours in an eight-hour workday. (R. at 304.) Dr. Titha found that he could walk for up to two hours at a time and for a total of four hours in an eight-hour workday. (R. at 304.) Dr. Titha found that Hawthorne could reach, handle, finger, feel and push/pull objects with the hands frequently and that he could use both feet for the operation of foot controls

-11-

frequently. (R. at 305.) Dr. Titha found that he could frequently climb stairs, ramps, ladders and scaffolds, balance, stoop, kneel, crouch and crawl frequently. (R. at 306.) Dr. Titha found that Hawthorne could occasionally work at unprotected heights and around moving mechanical parts, operate a motor vehicle, work around humidity and wetness and work around dust, odors, fumes and pulmonary irritants. (R. at 307.) Dr. Titha further found that Hawthorne could frequently work in temperature extremes and around vibrations and that he could work around moderate levels of noise. (R. at 307.)

On August 11, 2009, Hawthorne complained of continued back and neck pain. (R. at 334.) He had low back tenderness with decreased forward flexion. (R. at 334.) Goodman diagnosed acute exacerbation of chronic low back pain, and Hawthorne received a Toradol injection. (R. at 334.) On August 27, 2009, Hawthorne complained of a cough, dyspepsia, low back pain and headache. (R. at 333.) He was diagnosed with bronchitis, low back pain, headaches and an abnormal EKG. (R. at 333, 347.)

Hawthorne saw Dr. Matthew W. Wood Jr., M.D., on September 24, 2009, for a neurosurgical evaluation of his back pain. (R. at 351.) Hawthorne reported nonradicular back pain for one year. (R. at 351.) He denied bowel or bladder problems or foot drop. (R. at 351.) He complained of no numbness or tingling. (R. at 351.) Hawthorne reported balance difficulty since brain surgery in 2007. (R. at 351.) Dr. Wood noted no significant findings on the thoracic MRI study. (R. at 351.) With regard to the lumbar MRI, Dr. Wood noted the very small central disc protrusion at L4-5 and L5-S1 with no signs of severe stenosis. (R. at 351.)

-12-

Physical examination showed that Hawthorne's extraocular movements were intact, and pupils were equal, round and reactive to light and accommodation, and facial features were symmetric. (R. at 351.) Hawthorne had a regular heart rate and rhythm without murmur, rub or gallop. (R. at 351.) He had a full range of motion of the cervical spine, and grip was symmetrical. (R. at 351.) Hoffmann's signs[11] were negative, and reflexes were 2+. (R. at 351.) Toes were downgoing, and dorsiflexion and plantar flexion were intact. (R. at 351.) Straight leg raise testing was negative, hip examination was benign, and gait and station were slightly guarded and mildly broad. (R. at 351.) Cerebellar testing was performed appropriately with regard to finger-to-nose testing as well as rapid palm maneuvers and graphesthesia. (R. at 351.) Romberg's sign was negative, and there were no signs of pronator drift. (R. at 351.) Hawthorne also was otherwise neurologically intact. (R. at 351.) Dr. Wood diagnosed back pain, mild central disc protrusion at the L4-5 level, hypertension and elevated cholesterol. (R. at 351.) He opined that no surgical intervention was necessary with regard to Hawthorne's back pain. (R. at 351.) Physical therapy and a lumbar epidural injection were recommended. (R. at 351.) On October 13, 2009, Dr. William M. Platt, M.D., administered an epidural steroid injection, which Hawthorne tolerated very well. (R. at 349.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).

---

[11] Hoffmann's sign refers to a sudden nipping of the nail of the index, middle or ring finger, producing flexion of the terminal phalanx of the thumb and of the second and third phalanx of some other finger. *See* Dorland's at 1523.

This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1250(a), 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hawthorne argues only that the ALJ erred by failing to accord proper weight to the opinion of his treating source at Family Care Center, Judy Street, F.N.P. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-9.) He does not challenge the ALJ's findings regarding his mental residual functional capacity.

As stated above, the court's function in this case is limited to determining

-14-

whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Hawthorne argues that the ALJ erred by failing to accord proper weight to the opinion of Judy Street, F.N.P., his treating source at Family Care Center. (Plaintiff's Brief at 7-9.) I disagree. In particular, it is Street's opinion that Hawthorne was permanently disabled from working that he argues was not given appropriate weight. He argues that such opinion is supported by his treatment history, as well as objective medical testing. More specifically, Hawthorne emphasizes his treatment for thoracic spine pain, lumbar spine pain, neck pain,

-15-

Schmorl's nodes of the thoracic spine, degenerative disc disease and status post brain tumor.

I first note that Street's opinion that Hawthorne is permanently disabled from working is an issue that is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) (2011). It is true, as Hawthorne states, that such an opinion cannot be completely disregarded, as the Commissioner must consider all of the evidence in a claimant's record when making a disability determination. Social Security Ruling 96-5p provides as follows:

> Adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. … If the record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

S.S.R. 96-5p, WEST'S SOCIAL SECURITY REPORTING SERVICE, 1992-2011 (West Supp. 2011).

Additionally, despite not being considered an "acceptable medical source" under the regulations for purposes of diagnosing an impairment, Street, a family nurse practitioner, is considered an "other source" under 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) who can opine on the severity of a claimant's impairments and their effect on the ability to function. The opinions of such an "other source" are to be considered using the same factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d) for the evaluation of medical opinions from "acceptable medical sources." Such factors include the length and frequency of treatment, consistency of the opinion with the other evidence, degree of relevant supporting

-16-

evidence, how well explained the opinion is, whether the source has an area of expertise related to the claimant's impairments and any other factors tending to support or refute the opinion.

All of this being said, I find that substantial evidence supports the ALJ's decision to reject Street's disability opinion, as it is not supported by the other evidence of record. First, I note that neither the diagnostic testing, Hawthorne's course of treatment nor the physical examination findings support such a finding of disability. For instance, x-rays of the lumbosacral spine taken on March 26, 2009, showed spina bifida of the S1 vertebra. (R. at 348.) A June 9, 2009, MRI of the lumbar spine showed small central disc protrusions at the L4-5 and L5-S1 levels with no evidence of spinal or foraminal stenosis or nerve root impingement. (R. at 341.) An MRI of the thoracic spine taken the same day showed only early degenerative changes in the disc spaces between T7 and T10 with Schmorl's nodes formation and a small bulging annulus at T9-T10. (R. at 340.) Hawthorne saw three neurologists for evaluation, none of whom recommended surgical intervention. Most recently, in September 2009, Hawthorne saw Dr. Wood, who recommended physical therapy and an epidural steroid injection. (R. at 351.) Physical examinations were consistently unremarkable. In April 2009, Hawthorne had full range of motion in upper and lower extremities, full muscle strength for all groups tested, normal muscle tone in all extremities, normal deep tendon reflexes, absent Babinski's reflex, normal sensory examination, negative Romberg's sign, stable gait and station and normal coordination. (R. at 328.) A nerve conduction study also was normal. (R. at 327, 329-32.) In June 2009, Hawthorne's gross and fine manipulation were normal, there was no kyphosis or scoliosis of the back, no paravertebral muscle spasms, and straight leg raise testing was negative to 90

degrees. (R. at 313-14.) Cranial nerves were intact, and Hawthorne had full strength in all extremities. (R. at 314.) Sensory examination was normal in all extremities, deep tendon reflexes were 2+, and Romberg's sign was negative. (R. at 314.) Dr. Titha stated that Hawthorne did not use an ambulatory device and that neurological examination was "completely normal and does not have any cerebellar signs." (R. at 314.)

In September 2009, Hawthorne had a full range of motion of the cervical spine, and grip strength was symmetrical. (R. at 351.) Hoffmann's signs were negative, and reflexes were 2+. (R. at 351.) Toes were downgoing, and dorsiflexion and plantar flexion were intact. (R. at 351.) Straight leg raise testing was negative, hip examination was benign, and gait and station were only slightly guarded and mildly broad. (R. at 351.) Cerebellar testing was performed appropriately. (R. at 351.) Romberg's sign was negative, and there were no signs of pronator drift. (R. at 351.) Hawthorne was otherwise neurologically intact. (R. at 351.)

Street's disability opinion also is inconsistent with the opinions of the state agency physicians, both of whom found that Hawthorne could perform medium work, that he had an ability to occasionally balance and climb and that he should avoid concentrated exposure to hazards, such as heights and machinery. (R. at 1-93.)

Lastly, I find that Street's opinion that Hawthorne is permanently disabled is inconsistent with her own treatment notes. In particular, when Hawthorne saw Street on May 26, 2009, she diagnosed fatigue and pain in the thoracic and lumbar

-18-

spine. (R. at 337.) She gave Hawthorne home physical therapy exercises. (R. at 337.) On June 17, 2009, Hawthorne's diagnoses remained the same, but Street inexplicably opined that he was permanently disabled. (R. at 335-36.) She apparently based this opinion on her treatment of Hawthorne for pain of the thoracic spine and lumbar spine, neck pain, Schmorl's nodes of the thoracic spine, degenerative disc disease and status-post brain tumor. (R. at 335.) However, it is well-settled that a mere diagnosis is insufficient to constitute a finding of disability. Instead, it is the functional limitations associated therewith that must be evaluated in making such a finding. For the reasons already stated, Hawthorne's functional limitations resulting from his impairments are not sufficient to warrant a finding of disability.

It is for all of these reasons that I find that substantial evidence supports the ALJ's rejection of Street's disability opinion. I further find that substantial evidence supports the ALJ's physical residual functional capacity finding as stated herein.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's rejection of Street's opinion that Hawthorne is permanently disabled;

2. Substantial evidence exists to support the Commissioner's physical residual functional capacity

-19-

finding; and

3.  Substantial evidence exists to support the Commissioner's finding that Hawthorne was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hawthorne's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    October 24, 2011.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE